**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1. Community Health Development Partners, LLC; | ) | |
| 2. CHDP Lake Havasu, LLC; | ) | |
| 3. CHDP Pahrump, LLC; | ) | |
| 4. CHDP Elko, LLC; | ) | |
| 5. Elko Community Health Center, LLC; | ) | |
| 6. Lake Havasu Community Health Center, LLC; | ) | |
| 7. Pahrump Community Health Center, LLC; | ) | |
| 8. Jarrett Portz; | ) | |
| 9. David Lutz; and | ) | |
| 10. Aristotle Investment Holdings, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. <u>CIV-24-295-R</u> |
| | ) | |
| 1. Chris E. Osborne; | ) | |
| 2. Taylor Horst; and | ) | |
| 3. Bill Nelson, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs Community Health Development Partners, LLC ("CHDP"), CHDP Lake

Havasu, LLC ("CHDP Lake Havasu"), CHDP Pahrump, LLC ("CHDP Pahrump"), CHDP

Elko, LLC ("CHDP Elko", and with CHDP Lake Havasu and CHDP Pahrump,

collectively, "CHDP Borrowers"), Elko Community Health Center, LLC ("Elko CHC"),

Lake Havasu Community Health Center, LLC ("LH CHC"), Pahrump Community Health

Center, LLC ("Pahrump CHC", and with Elko CHC and Lake Havasu CHC, collectively,

"Community Health Centers"), Jarrett Portz ("Portz"), David Lutz ("Lutz"), and Aristotle

Investment Holdings, LLC ("Aristotle", and with CHDP, CHDP Borrowers, Community Health Centers, Portz, and Lutz, collectively, "Plaintiffs"), bring this Complaint against Defendants Chris E. Osborne ("Osborne"), Taylor Horst ("Horst"), and Bill Nelson ("Nelson", and with Osborne and Horst, collectively, "Defendants"), and in support allege and state as follows:

## PARTIES AND JURISDICTION

1.      CHDP is a Nebraska limited liability company with a principal place of business in Nebraska with two members, Portz and Aristotle.  Portz is a citizen of Arizona.  Aristotle is a Nebraska limited liability company with a principal place of business in Nebraska and has one member, Lutz, who is a citizen of Nebraska.

2.      CHDP Lake Havasu is an Arizona limited liability company with a principal place of business in Arizona with three members, CHDP, Desert Land Group, LLC, and Swanson Investors, LLC.  Desert Land Group, LLC is an Arizona limited liability company with a principal place of business in Arizona and has two members, Luke Still, a citizen of Arizona, and Mychal R. Gorden, a citizen of Arizona.   Swanson Investors, LLC is an Arizona limited liability company with a principal place of business in Arizona and has one member, Jack D. Dunn, a citizen of Arizona.

3.      CHDP Pahrump is a Nevada limited liability company with a principal place of business in Missouri, with two members, CHDP and JCrawley LLC.  JCrawley LLC is an Arizona limited liability company with a principal place of business in Arizona and has one member, Jesse Crawley, who is a citizen of Arizona.

2

4.     CHDP Elko is a Nevada limited liability company with a principal place of business in Nebraska, with two members, CHDP and Invoegen Surgical Services, L.L.C. Invoegen Surgical Services, L.L.C. is a Nevada limited liability company with a principal place of business in Nevada and has one member, Tony Burns, who is a citizen of Puerto Rico.

5.     Elko CHC is a Nevada limited liability company with a principal place of business in Nevada with nine members, CHDP Elko, CHDP Investments I, LLC, DDS Properties, LLC, John Gull, Nick Rizzo, James Pappas, James Coopoer, Nathaniel Boardbent, and Song Family Trust.  CHDP Investments I, LLC is a Nevada limited liability company with a principal place of business in Nevada with fifteen members, Jesse Crawley, Robinson Liquidity Enterprises, LLC, John Portz, Terri Callahan, Swanson Investors, LLC, Glenn Nudelman, Carlevato Family 2003 Trust, Mims Family Trust, Stephen Loos, Edmund Pillsbury, Kinsey Pillsbury, Gary Turner, Farres Ahmed, John Erogul, and Erik Maki.  Robinson Liquidity Enterprises, LLC is an Arizona limited liability company with a principal place of business in Arizona and has one member, Robert W. Robinson, who is a citizen of Arizona.  John Portz is a citizen of Arizona.  Terri Callahan is a citizen of Nevada.  Glenn Nudelman is a citizen of Arizona.  The Carlevato Family 2003 Trust is organized and existing under and by the laws of Nevada. The Mims Family Trust is organized and existing under and by the laws of Nevada.  Stephen Loos is a citizen of Nevada.  Edmund Pillsbury is a citizen of Nevada.  Kinsey Pillsbury is a citizen of Nevada. Gary Turner is a citizen of Nevada. Farres Ahmed is a citizen of Nevada. John Erogul is a citizen of Nevada.  Erik Maki is a citizen of Nevada.  DDS Properties, LLC is

a Nevada limited liability company with a principal place of business in Nevada and has one member, Dusty Shipp, who is a citizen of Nevada.  John Gull is a citizen of Arizona. Nick Rizzo is a citizen of Arizona.  James Pappas is a citizen of Nevada.

James Coopoer is a citizen of Nevada.  Nathaniel Boardbent is a citizen of Nevada.  The Song Family Trust is organized and existing under and by the laws of Nevada.

6.      LH CHC is a Arizona limited liability company with a principal place of business in Arizona with two members, CHDP Lake Havasu and CHDP Investments II, LLC.  CHDP Investments II, LLC is a Arizona limited liability company with a principal place of business in Arizona with seven members, Robert W. Robinson, Carlevato Family 2003 Trust, Mims Family Trust, Stephen Loos, Farres Ahmed, Portz, and Aristotle.

7.      Pahrump CHC is a Nevada limited liability company with a principal place of business in Nevada with three members, CHDP, JCrawley LLC, and CHDP Investments III, LLC.  CHDP Investments III, LLC is a Nevada limited liability company with a principal place of business in Nevada with four members, Nick Reynolds, Terry Reynolds Cristine Robinson, and the Carlevato Family 2003 Trust.  Nick Reynolds is a citizen of Arizona.  Terry Reynolds is a citizen of Arizona.  Christine Robinson is a citizen of Arizona.

8.      Upon information and belief, Osborne is a citizen of Oklahoma.

9.      Upon information and belief, Horst is a citizen of Colorado.

10.     Upon information and belief, Nelson is a citizen of Oklahoma.

11.     Therefore, there is complete diversity of citizenship, the amount in controversy exceeds $75,000.00, and venue is proper in this district.  *See* 28 U.S.C. § 1332; 28 U.S.C. § 1391(b).

## FACTS

12.     On December 30, 2020, BancCentral, National Association (the "Bank") made a loan to CHDP Elko, an affiliate of CHDP, to partially finance the construction of an ambulatory surgery center ("ASC") in Elko, Nevada, and a Promissory Note (collectively the "Elko Loan"). As understood and contemplated by the parties at the time of closing, CHDP Elko utilized the proceeds of the Elko Loan to fund a "leverage loan" through a structure utilizing new market tax credits ("NMTC"). CHDP Elko and its affiliates realized the benefit of the NMTC loans through Elko CHC receiving loans from a "community development entity" lender ("CDE Lender") to fund the construction of the Elko ASC.

13.     On December 30, 2020, CHDP, Portz, Lutz, and Aristotle entered a Guaranty Agreement related to the Elko Loan (the "Elko Guaranty").

14.     On October 29, 2021, the Bank made a loan to CHDP Lake Havasu, an affiliate of CHDP, to partially finance the construction of an ASC in Lake Havasu City, Arizona, and a Promissory Note (collectively the "LHC Loan"). As understood and contemplated by the parties at the time of closing, CHDP Lake Havasu utilized the proceeds of the LHC Loan to fund a NMTC leverage loan. CHDP Lake Havasu and its affiliates realized the benefit of the NMTC loans through LH CHC receiving loans from a CDE Lender to fund the construction of the Lake Havasu ASC.

15.     On October 29, 2021, CHDP, Portz, Lutz, and Aristotle entered a Guaranty Agreement related to the LHC Loan (the "LHC Guaranty").

16.     In November 2021, the Office of the Comptroller of the Currency ("OCC") and the Bank entered into a Consent Order.  Pursuant to the Consent Order, the Comptroller found that:

> [T]he Bank has engaged in unsafe or unsound practices regarding management and board supervision, strategic and capital planning, risk ratings and loan review, credit administration, and the allowance for loan and lease losses. These unsafe or unsound practices resulted in violations of 12 U.S.C. § 161.

17.     The Consent Order further provides that "[t]he Bank shall achieve by March 31, 2022, and thereafter maintain… a leverage ratio at least equal to nine percent (9%)."

18.     Upon information and belief, the Bank's liquidity and capitalization issues have continued to be problematic for the Bank.  To wit, the Bank is presently in violation of the Consent Order.

19.     On March 17, 2022, the Bank made an additional loan to CHDP Lake Havasu, an affiliate of CHDP, to further finance the construction of the Lake Havasu ASC, and a Promissory Note (collectively the "LHC 2 Loan"). As understood and contemplated by the parties at the time of closing, CHDP Lake Havasu utilized the proceeds of the LHC 2 Loan to fund a NMTC leverage loan. CHDP Lake Havasu and its affiliates realized the benefit of the NMTC loans through LH CHC receiving loans from a CDE Lender to fund the construction of the Lake Havasu ASC.

20.     On March 17, 2022, CHDP, Portz, Lutz, Aristotle, and others entered a Guaranty Agreement related to the LHC 2 Loan (the "LHC 2 Guaranty").

21.     On March 18, 2022, the Bank made a loan to CHDP Pahrump, an affiliate of CHDP, to partially finance the construction of an ASC in Pahrump, Nevada, and a Promissory Note (collectively the "Pahrump Loan", and with the Elko Loan, LHC Loan, and LHC 2 Loan, collectively, the "Loans"). As understood and contemplated by the parties at the time of closing, CHDP Pahrump utilized the proceeds of the Pahrump Loan to fund a NMTC leverage loan. CHDP Pahrump and its affiliates realized the benefit of the NMTC loans through Pahrump CHC receiving loans from a CDE Lender to fund the construction of the Pahrump ASC (with the Elko ASC and Lake Havasu ASC, collectively, the "ASCs").

22.     On March 18, 2022, CHDP, Portz, Lutz, and Aristotle entered a Guaranty Agreement related to the Pahrump Loan (the "Pahrump Guaranty", and with the Elko Guaranty, LHC Guaranty, and LHC 2 Guaranty, collectively, the "Guaranty Agreements").

23.     Although the NMTC hierarchy has multiple tiers and involves numerous legal entities, the Loans were at all times planned in their respective totality. To wit, all funding documents for each entire NMTC leverage loan structure were executed contemporaneously. The Bank and Defendants representations to various parties at each respective tier were relied upon by the parties to every other tier, to include the Plaintiffs. The Plaintiffs would not have entered into the Loans but for the representations and understandings related to the NMTC leverage loan hierarchy.

24.     The term sheets executed between the Bank and CHDP Borrowers for each of the Loans (the "Term Sheets,") provided the basis for the substantive terms for the definitive legal documents for the NMTC loans. The Term Sheets clearly described the

purposes of the Loans and the collateral positions of the Bank.  The Transaction Documents, as defined below, are all consistent with the original deal terms as set forth in the Term Sheets.

25.     At the respective closings of the Loans, the following respective legal agreements were entered into reflecting certain rights and obligations of CHDP Borrowers and their affiliates, and the Bank: (i) Loan and Security Agreement; (ii) Collateral Assignment of Membership Interests; (iii) Collateral Assignment, Pledge and Security Agreement; (iv) Promissory Note; and (v) Guaranty.  In addition, the Bank executed the following documents which evidenced certain rights of the CDE Lenders and obligations of the Bank: (vi) Disbursing Agreement; and (vii) Account Pledge and Control Agreements (the "Account Agreement").  The documents referenced in (i) – (vii) above are collectively referred to herein as the "Transaction Documents."

26.     The Bank's representations, warranties, and covenants in the Account Agreement were relied upon by the Plaintiffs and CDE Lenders.

27.     The Account Agreement is an integral part of the Transaction Documents, without which the Plaintiffs and CDE Lenders would not have entered into the Loans.

28.     On February 2, 2021, approximately 30 days after the closing of the Elko Loan, the Bank, acting at the direction of Osborne, a Director of the Bank (herein together with Horst, and others, the "Board"), and others, circulated a draft Cash Deposit and Security Agreement ("Cash Deposit Agreement") for review by certain of the Plaintiffs and others.  The Bank's purported reason for requiring the Cash Deposit Agreement after the Elko Loan closing was to ease the concerns of regulators regarding the Elko Loan.

Certain of the Plaintiffs were advised that the Cash Deposit Agreement would not impact the ability to use the Loans' proceeds.  Certain of the Plaintiffs executed the Cash Deposit Agreement as an accommodation to the Bank.

29.    While the Loans' proceeds were deposited into accounts with the Bank, the Bank and Defendants understood that the Community Health Centers needed the Loans' proceeds to fund construction of the ASCs. Defendants later claimed that the Bank could refuse the release of the proceeds pursuant to the Cash Deposit Agreements.

30.    The Transaction Documents clearly established that: (i) the CDE Lenders retained sole control over and had the sole security interest in the accounts at the Bank; (ii) the Bank had no security interest in or other rights to the funds held in the Bank accounts; (iii) the Bank was specifically directed to follow the instructions of the CDE Lenders and the disbursement agent; and (iv) the Bank explicitly acknowledged that it had no knowledge of any other security interests (including its own) in the Bank accounts.

31.    After funding the Loans, Defendants began a pattern of refusing to follow the instructions of the CDE Lenders and alleging the Bank has a security interest in, or other rights to, the funds held in the Bank accounts.

32.    Defendants represented to certain of the Plaintiffs that the Bank would not release the Loans' proceeds for use with the ASCs unless Plaintiffs decreased CHDP Borrowers' liabilities with the Bank.  While the Defendants had no right to withhold the Loans' proceeds, on September 6, 2022, CHDP Elko refinanced the Elko Loan, resulting in more than $1,400,000.00 of damages, to include a higher cost of capital, over the

subsequent three years.  Certain of the Plaintiffs were forced to refinance the Elko Loan in order to get the Board to release funds for the Lake Havasu and Pahrump ASCs.

33.     On May 2, 2022, the Board suggested that the Bank may be able to approve cash releases if CHDP Borrowers agreed to a change in terms to the Loans, including a significant change to the respective loan interest rate and a significantly shorter term.

34.     On March 29, 2023, Portz met with the Board and discussed the challenges of getting funds released.  In response, the Board assured Portz that they would honor the Bank's agreements and release funds, and also attempted to convince Portz to make a substantial investment in the Bank.  Following the meeting with the Board, Portz had lunch with the Board where they continued to reassure Portz that they would release the Loans' proceeds and continued to press him to invest in the Bank.

35.     As of August 24, 2023, Defendants had (i) refused to release funds for construction; (ii) attempted to renegotiate terms on economically performing loans that were not in default; (iii) attempted to extract additional collateral from unrelated projects for no consideration; and (iv) suggested that the Bank would only uphold and fulfill its legal obligations if Portz paid down completely unrelated debt.

36.     On August 28, 2023, certain of the Plaintiffs sent a demand letter to the Bank requesting the immediate release of all funds held for the Lake Havasu and Pahrump ASC projects.  Consent of the CDE Lenders to move the funds from the Bank to an account held by one of the CDE Lenders had been obtained.

37.     Portz and Lutz had numerous discussions with Defendants requesting the withdrawal of funds contained in the relevant Bank accounts for purposes consistent with

the loans.  After meeting personally with Horst, a Director of the Bank, and telephonically with Osborne, Defendants expressly approved and consented to the withdrawal of all loan funds and made the transfers as requested.  Horst and Lutz directly discussed the Cash Deposit Agreement during a conversation on the afternoon of August 28, 2023, and Horst and Osborne approved the withdrawal of the funds pursuant to approved wire transfer forms executed by the Bank and certain of the Plaintiffs.

38.     After Defendants approved of the withdrawal of the funds, and transferred the funds, Osborne sent an e-mail to Portz and Lutz on August 28, 2023 stating:

> I had no idea that these relationships were being mismanaged structure wise and 'event' wise on our end.
>
> This didn't happen overnight and its very obvious to me that we didn't' have senior management nor board members that stayed on top of making this work effectively for both of you.
>
> I am truly gut wrenched and deeply sorry for what this has done to [David], Jarrett and all of the successful business enterprises that each of you are a part of.

39.     Despite having approved of and consented to the release of funds, and CHDP Lake Havasu and CHDP Pahrump being current on payments, on October 18, 2023, the Bank, through counsel acting at the direction of Defendants, sent notices of default (the "Default Notices") to Plaintiffs.

40.     The Default Notices claim that "an event of default under the Cash Deposit Agreement constitutes an event of default under the Loan" citing to an incomplete quotation of a provision in the Cash Deposit Agreement.  Specifically, the Default Notices claim that certain of the Plaintiffs have failed to meet the obligations of the Cash Deposit

Agreement alleging that CHDP Lake Havasu and CHDP Pahrump have failed to maintain certain balances in the accounts.

41.     Section 3.1 of the Loans enumerates the events of default under the Loans. Failure to comply with the Cash Deposit Agreement is not an event of default under the Loans or the Transaction Documents.

42.     Following the receipt of the Default Notices, certain of the Plaintiffs responded to the Bank's Default Notices.  Therein, Defendants were reminded of the more complete provision contained in the Bank Deposit Agreement which provides:

> "Borrower shall at all times maintain a balance in the Account… *unless Lender* (i) approves of a reduction in the amount required to be maintained in the Account or (i) *approves withdraws from the Account pursuant to a request from Borrower…*"

Defendants were also reminded that Horst and Osborne had approved of the withdrawals and had wired out the funds. Defendants were further reminded that the LHC Loan, LHC 2 Loan, and Pahrump Loan were current on all payments, had always been current, and CHDP Lake Havasu and CHDP Pahrump had complied with all terms of the Transaction Documents.

43.     Despite the response, the Bank, through counsel acting at the direction of Defendants, sent a follow up letter again threatening default and acceleration of the LHC Loan, LHC 2 Loan, and Pahrump Loan related solely to an alleged failure to maintain the Cash Deposit Agreements.

44.     On February 2, 2024, the Bank, through counsel acting at the direction of Defendants, filed suit in a matter entitled *BancCentral v. CHDP Pahrump, LLC, David*

*Lutz, Jarrett Portz, Community Health Development Partners, LLC, and Aristotle Investment Holdings, LLC*, District Court of Woods County, State of Oklahoma, Case No. CJ-2024-8 (the "Pahrump Lawsuit").

45.     On the same day, the Bank filed suit in a matter entitled *BancCentral v. CHDP Lake Havasu, LLC, David Lutz, Jarrett Portz, Community Health Development Partners, LLC, Aristotle Investment Holdings, LLC, Desert Land Group, LLC, Luke Still, Mychal R. Gorden, Swanson Investors, L.L.C., and Jack D. Dunn*, District Court of Woods County, State of Oklahoma, Case No. CJ-2024-9 (the "Lake Havasu Lawsuit", and together with the Pahrump Lawsuit, the "Lawsuits").

46.     The Lawsuits falsely allege that certain of the Plaintiffs, together with others, have defaulted under the LHC Loan, LHC 2 Loan, and Pahrump Loan.

47.     The Lawsuits are verified by Nelson, Chief Credit Officer and Executive Vice President of the Bank.

48.     The Lawsuits have been removed from District Court of Woods County, State of Oklahoma, to this Court.

49.     Having accelerated the LHC Loan, LHC 2 Loan, and Pahrump Loan, the notes provide that the Bank is entitled to charge Plaintiffs additional interest at the default rate, as more particularly described in the respective loan agreements. Said additional default interest would exceed $42,000.00 per month (the "Additional Default Interest"), creating substantial damages for Plaintiffs.

50.     The Guaranty Agreements purport that the "Guarantor guarantees that the Obligations shall be paid strictly in accordance with the terms and provisions of the Source Loan Documents."

51.     The Bank, acting at the direction of Defendants, having breached the Loans, had no actual or good faith basis to accelerate the notes nor make demand under the Guaranty Agreements.

52.     The Bank, acting at the direction of Defendants, declared default of the Guaranty Agreements despite the fact that CHDP Lake Havasu and CHDP Pahrump are current on all payments, have always been current on all payments, and have not defaulted under the loan agreements.

53.     The Bank's wrongful acceleration, acting at the direction of Defendants, of the LHC Loan, LHC 2 Loan, and Pahrump Loan have caused damage to the Plaintiffs and has subjected them to damaging Additional Default Interest.

54.     During February 2024, Defendants communicated to prospective buyers of the Loans intentionally defamatory statements about certain of the Plaintiffs which caused, and is causing, injury to Plaintiffs.  Such statements include, among others, false statements that Portz and Lutz had "screwed over" and "duped" the Bank.  Such statements have caused, and are causing, Plaintiffs reputational harm which has damaged the ability to conduct and expand their business.

55.     On February 22, 2024, the Bank, through counsel acting at the direction of Defendants, sent notices of default to Portz, Lutz, and others which falsely alleges that certain of the Plaintiffs have defaulted under that certain loan with the Bank, numbered

26624, which is separate and apart from the Loans.  The only basis for the notice of default is the ongoing malicious prosecution in the Lawsuits.

56.     On February 22, 2024, the Bank, through counsel acting at the direction of Defendants, sent notices of default to Portz and others which falsely alleges that certain of the Plaintiffs have defaulted under that certain loan with the Bank, numbered 26600, which is separate and apart from the Loans.  The only basis for the notice of default is the ongoing malicious prosecution in the Lawsuits.

57.     On February 22, 2024, the Bank, through counsel acting at the direction of Defendants, sent notices of default to Portz, Lutz, Aristotle, and others which falsely alleges that certain of the Plaintiffs have defaulted under that certain loan with the Bank, numbered 26707, which is separate and apart from the Loans.  The only basis for the notice of default is the ongoing malicious prosecution in the Lawsuits.

58.     On February 22, 2024, the Bank, through counsel acting at the direction of Defendants, sent notices of default to Portz and others which falsely alleges that certain of the Plaintiffs have defaulted under that certain loan with the Bank, numbered 26244, which is separate and apart from the Loans (hereafter the notices of default for loans numbered 26624, 26600, 26707, and 26244 are collectively referred to as the "Affiliate Default Notices").  The only basis for the notice of default is the ongoing malicious prosecution in the Lawsuits.

## FIRST CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF THE IMPLIED
## <u>COVENENT OF GOOD FAITH AND FAIR DEALING/TORTIOUS BREACH</u>

59.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

60.     Not only was there no good faith basis for the Bank, acting at the direction of Defendants, to declare a default of the LHC Loan, LHC 2 Loan, and Pahrump Loan, accelerate the debt, declare a default of the Guaranty Agreements, file the Lawsuits, and allege default in the Affiliate Default Notices, but the Bank's conduct has been intentionally directed at Plaintiffs and others to harm them. Further, the Defendants' actions have been malicious, grossly negligent, and in reckless disregard. Defendants appear to have developed a plan to extract additional funds or security from Plaintiffs from which the Bank is not entitled to and/or to force Plaintiffs to refinance or payoff the loans, so that they no longer impact the Bank.

61.     Defendants created and approved of the situation for which the Bank now claims a default. After approving of and transferring the funds, Osborne apologized for the actions of the Bank. Subsequently, Defendants altered course and threatened Plaintiffs with a wrongful default and acceleration of the debt, knowing there had been no default and that the Loans' payments were current, and have always been current.  Then, after being advised of the damage that would result if the Bank continued its course of declaring a default and accelerating the loan debt, Defendants ignored Plaintiffs' pleas.

62.     The Loans are NMTC loans with multiple loan levels. With the loan levels, additional lenders were involved to which the Bank owed duties directly and also through CHDP Borrowers and Community Health Centers, and their affiliates. Defendants' actions

not only affect CDE Lenders directly, but also affects CDE Lenders through the actions the Bank takes toward CHDP Borrowers and Community Health Centers, and their affiliates.

63.    In addition, CHDP Borrowers and Community Health Centers were corporate depositors of the Bank, with substantial deposits in multiple accounts.  Such accounts, subject to the Account Agreement, were held in trust by the Bank under the control and for the benefit of the CDE Lenders.  The Plaintiffs and CDE Lenders, based, in part, on the Bank's obligations under the Account Agreement, had a trust, confidence, and reliance in the Bank regarding the deposit accounts rising to a special relationship.

64.    Defendants' actions to manufacture other basis of default with the Loans further support that the Defendants' actions seek to intentionally harm Plaintiffs and/or achieve some ulterior goal. In the Default Notices, the Bank, through counsel acting at the direction of Defendants, claimed that CHDP Lake Havasu and CHDP Pahrump had not delivered to the Bank true and correct copies of loan documents related to the leverage loan. This was the first claim of a non-delivery of any leverage loan documents since the closing of the LHC 2 Loan and Pahrump Loan over 17 months prior to the letter. Certain of the Plaintiffs responded by advising the Bank that they believed that the Bank had been provided with the leverage loan documents, but, nonetheless, provided the Bank with another copy of the leverage loan documents in their response of October 30, 2023.  Despite this and having not raised any additional issues in the Bank's letters of January 18, 2024, the Bank, through counsel acting at the direction of Defendants, has alleged that a failure to produce "financial documents and other information" is another event of default.

65.     WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

## SECOND CAUSE OF ACTION
## FRAUD/FRAUD IN THE INDUCEMENT/CONSTRUCTIVE FRAUD

66.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

67.     Defendants made false promises and misrepresentations to certain of the Plaintiffs and others, which were fraudulent to induce the Plaintiffs to enter into the Term Sheets and resultant Loans.

68.     The Bank, acting at the direction of Defendants, promised and represented, among other things that:

a.     The Loans' proceeds would be available for the construction of the ASCs.

b.     The Loans would not be secured by cash collateral.

c.     The Bank would hold the Loans' proceeds for the benefit of the Community Health Centers and their respective CDE Lenders, which does not include the Bank.

d.     The Bank acknowledged that all deposits held by the Bank had been irrevocably pledged, transferred, and assigned to CDE Lenders.

e.     The Bank covenanted to comply with all instructions it receives directing disposition of deposited funds by a disbursing agent acting on behalf of CDE Lenders.

f.     The Bank represented that it approved of and consented to the withdrawal of the deposited funds.

g.     The Bank represented that a refinance of the Elko Loan eliminate holds against deposited funds.

69.     The Bank, acting at the direction of and through Defendants, purposefully misrepresented the terms and its intended servicing of the Loans which were material and were intended for Plaintiffs to act upon, causing substantial injury to Plaintiffs.

70.     Defendants knew the misrepresentations were false when the representations were made or the Defendants made the representations recklessly without the knowledge of the truth of the representations as a positive assertion.

71.     But for those representations, Plaintiffs would never have entered into the Loans.

72.     WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

### THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT / BUSINESS RELATIONS

73.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

74.     The Community Health Centers had valid contracts with their contractors and vendors (together, "Suppliers") for the construction of the ASCs.

75.     CHDP Borrowers had valid contracts with various individual and entity investors as part of the NMTC leverage loans ("Investors").

76.     At all relevant times, Defendants had knowledge of the leverage loans, the purpose of the loan proceeds, the Community Health Centers' construction of the ASCs, the Suppliers, and the Investors.

77.     Defendants willfully and intentionally interfered with Suppliers' contracts by intentionally and wrongfully withholding funds from certain of the Plaintiffs, thereby causing the Community Health Centers to be unable to timely pay Suppliers.

78.     Defendants' actions forced certain of the Plaintiffs to breach their obligations with Investors.

79.     Defendants' actions forced the Community Health Centers to delay construction of the ASCs, incur penalties and late fees from Suppliers, and to borrow funds to pay Suppliers at a higher cost of capital.

80.     The forced delays in constructing the ASCs have caused Community Health Centers to incur additional interest on loans and lost operating profits.

81.     The inability to timely pay Suppliers, delays in constructing the ASCs, and the forced breach of obligations owed to Investors have caused Plaintiffs significant reputational harm.

82.     WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

## FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH A PROSPECTIVE CONTRACT

83.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

84.     WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive

damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE

85.     Defendants had a duty to act in good faith and with ordinary care and diligence when conducting the Bank's affairs.

86.     Defendants breached these duties owed to Plaintiffs by:

      a.      Failing to exercise due care when servicing the Loans;

      b.      Failing to honor disbursement requests from CDE Lenders or disbursing agents;

      c.      Failing to comply with the OCC Consent Order;

      d.      Failing to comply with OCC legal lending limits;

      e.      Declaring the Loans in default despite no events of default occurring;

      f.      Accelerating the Loans despite no event of default occurring;

      g.      Misrepresenting to Plaintiffs that Defendants would comply with instructions directing the disposition of deposited funds;

      h.      Misrepresenting to Plaintiffs that the Loan proceeds would be available for construction;

      i.      Misrepresenting to Plaintiffs that the Loans would not be secured by cash collateral; and

      j.      Alleging default for loans numbered 26624, 26600, 26707, and 26244 in the Affiliate Default Notices.

87.     As a direct and proximate result of the negligence of Defendants, Plaintiffs have suffered damages. Said damages were directly and proximately caused by the negligence of Defendants and were incurred without contributory negligence or assumption of the risk on the part of Plaintiffs.

88.     WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

## SIXTH CAUSE OF ACTION
### SLANDER

89.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

90.     WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

Respectfully submitted,

*/s/ Jason A. Sansone*
Lyndon W. Whitmire, OBA No. 17164
Jason A. Sansone, OBA No. 30913
**PHILLIPS MURRAH P.C.**
101 North Robinson, Suite 1300
Oklahoma City, OK  73102
Telephone: (405) 235-4100
Facsimile:  (405) 235-4133
lwwhitmire@phillipsmurrah.com
jasansone@phillipsmurrah.com
***Attorneys for Plaintiffs Community Health Development Partners, LLC, CHDP Lake Havasu, LLC, CHDP Pahrump, LLC, CHDP Elko, LLC, Elko Community Health Center, LLC, Lake Havasu Community Health Center, Pahrump Community Health Center, LLC, Jarrett Portz, David Lutz, and Aristotle Investment Holdings, LLC***