## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| COMMUNITY HEALTH DEVELOPMENT PARTNERS LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-24-295-SLP |
| CHRIS E. OSBORNE, et al., | ) ) | |
| Defendants. | ) ) | |

## **O R D E R**

Before the Court is the Motion to Dismiss [Doc. No. 18] filed by Defendants Chris E. Osborne, Taylor Horst, and Bill Nelson. Plaintiffs Community Health Development Partners, LLC ("CHDP"), CHDP Lake Havasu, LLC, CHDP Pahrump, LLC, CHDP Elko, LLC, Elko Community Health Center, LLC, Lake Havasu Community Health Center, LLC, Pahrump Community Health Center, LLC, Jarrett Portz, David Lutz, and Aristotle Investment Holdings, LLC filed a Response [Doc. No. 25]. Defendants did not reply, and the time to do so has passed. The Motion is DENIED.

### I.    **Factual Background**[1]

The Plaintiffs in this action are all individuals and entities associated with the construction of certain ambulatory surgery centers ("ASCs") in the western United States. Defendants are officers of BancCentral, the lender for a series of loans supporting the

---

[1] The Court accepts all well-pleaded factual allegations in the Complaint as true and construes them in the light most favorable to Plaintiff. *See Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1102 (10th Cir. 2019).

financing and construction of the ASCs.  Four different loans are the subject of this Complaint.[2]

The bank made the first loan at issue to Plaintiff CHDP Elko on December 30, 2020.  The parties intended for CHDP Elko to use the proceeds of this loan "to fund a 'leverage loan' through a structure utilizing new market tax credits ('NMTC')."  [Doc. No. 1] ¶ 12.  Indeed,  "CHDP Elko and its affiliates realized the benefit of the NMTC loans through Elko CHC receiving loans from a 'community development entity' lender ('CDE Lender') to fund the construction of the Elko ASC."  *Id.*  At the same time the bank executed the promissory note, Plaintiffs CHDP, Portz, Lutz, and Aristotle ("the Guarantor Plaintiffs") executed a guaranty agreement related to the loan.

In October of the following year, the bank made the second loan to CHDP Lake Havasu to partially finance another ASC.  Like the first loan, the parties intended CHDP Lake Havasu to use "the proceeds of [this] loan to fund a NMTC leverage loan."  *Id.* ¶ 14.  And, like the Elko loan, "CHDP Lake Havasu and its affiliated realized the benefit of the NMTC loans through LH CHC receiving loans from a CDR Lender to fund the construction of the Lake Havasu ASC."  *Id.*  The Guarantor Plaintiffs also executed a guaranty agreement as to this loan.

The bank made the third loan on March 17, 2022, also to CHDP Lake Havasu, "to further finance the construction of the Lake Havasu ASC."  *Id.* ¶ 19.  The proceeds from

---

[2] This dispute is part of a larger series of litigation between the parties and their associates.  All related litigation has been consolidated into Case No. CIV-24-368-SLP.  Based on the denial of the instant Motion, the Court will consolidate this action into Case No. CIV-24-368-SLP by separate order.

this loan, like the previous loan, were intended "to fund a NMTC leverage loan," and "CHDP Lake Havasu and its affiliated realized the benefit of the NMTC loans through LH CHC receiving loans from a CDE Lender to fund the construction of the Lake Havasu ASC." *Id.* As with the previous loans, the Guarantor Plaintiffs executed a guaranty agreement related to this loan.

The next day, the bank made a loan to CHDP Pahrump "to partially finance the construction of an ASC in Pahrump, Nevada." *Id.* ¶ 21. CHDP Pahrump used "the proceeds of [this] loan to fund a NMTC leverage loan," and it "realized the benefit of the NMTC loans through Pahrump CHC receiving loans from a CDE Lender to fund the construction of the Pahrump ASC." *Id.* Finally, the Guarantor Plaintiffs again executed a guaranty agreement. Plaintiffs allege that "the Loans were at all times planned in their respective totality," and they "would not have entered into the Loans but for the representations and understandings related to the NMTC leverage loan hierarchy." *Id.* ¶ 23.

Broadly speaking, Plaintiffs allege Defendants interfered with their ability to use the proceeds of the loans for their intended purpose. The documents supporting the loans established that "the CDE Lenders retained sole control over and had the sole security interest in the accounts held at the Bank," and, conversely, "the Bank had no security interest in or other rights to the funds held in the Bank accounts." *Id.* ¶ 30. The bank also agreed "to follow the instructions of the CDE Lenders and the disbursement agent." *Id.* Nevertheless, "Defendants began a pattern of refusing to follow the instructions of

the CDE Lenders and alleging the Bank has a security interest in, or other rights to, the funds held in the Bank accounts." *Id.* ¶ 31.

About a month after the closing of the first loan, BancCentral—"acting at the direction of Osborne, a Director of the Bank . . . and others"—"circulated a draft Cash Deposit and Security Agreement" for Plaintiffs' review. *Id.* ¶ 28. BancCentral reported that the agreement would "ease the concerns of regulators regarding" the first loan.[3] *Id.* ¶ 28. Although Plaintiffs were assured the agreement "would not impact the ability to use the Loans' proceeds," Defendants later relied on the agreement to argue BancCentral "could refuse the release of the proceeds." *Id.* ¶¶ 28–29.

In May 2022, "the Board suggested that the Bank may be able to approve cash releases if [Plaintiffs] agreed to a change in terms to the Loans,"[4] including significantly shorter terms and different interest rates. *Id.* ¶ 33. About four months later, Plaintiffs were required to refinance the first loan. *See id.* ¶ 32. "Plaintiffs were forced to refinance [this] Loan in order to get the Board to release funds for the Lake Havasu and Pahrump ASCs" after "Defendants represented to certain of the Plaintiffs that the Bank would not release the Loans' proceeds . . . unless Plaintiffs decreased [their] liabilities

---

[3] As set forth in the Complaint, BancCentral entered into a consent order with the Comptroller of the Currency in November 2021—shortly after the second loan. That order recognized the bank's "unsafe or unsound practices regarding management and board supervision, strategic and capital planning, risk ratings and loan review, credit administration, and the allowance for loan and lease losses." [Doc. No. 1] ¶ 16. The consent order required the bank to achieve a certain leverage ratio by March 31, 2022. *Id.* ¶ 17. Nevertheless BancCentral has continued to have "liquidity and capitalization issues" such that it "is presently in violation of the Consent Order." *Id.* ¶ 18.

[4] As set forth in the Complaint, "the Board" refers to Defendants Horst, Osborne, "and others." *Id.* ¶ 28.

with the Bank." *Id.* Plaintiffs allege this forced refinancing caused more than $1,400,000 in damages. *Id.*

In March 2023, Plaintiff "Portz met with the Board and discussed the challenges of getting funds released." *Id.* ¶ 34. After this meeting, the Board twice assured Plaintiff Portz that BancCentral "would honor [its] agreements and release funds." *Id.* The Board "also attempted to convince Portz to make a substantial investment in the Bank." *Id.* But by August of that year:

> Defendants had (i) refused to release funds for construction; (ii) attempted to renegotiate terms on economically performing loans that were not in default; (iii) attempted to extract additional collateral from unrelated projects for no consideration; and (iv) suggested that the Bank would only uphold and fulfill its legal obligations if Portz paid down completely unrelated debt.

*Id.* ¶ 35. In response, some of the Plaintiffs sent a demand letter to BancCentral on August 28, 2023. *Id.* ¶ 36. With the support of the CDE Lenders, they "request[ed] the immediate release of all funds held for the Lake Havasu and Pahrump ASC projects." *Id.*

Plaintiffs Portz and Lutz met with Defendants Horst and Osborne, who "approved the withdrawal of the funds pursuant to approved wire transfer forms executed by the Bank and certain of the Plaintiffs" on August 28, 2023. *Id.* ¶ 37. The following day, Defendant Osborne emailed Plaintiffs Portz and Lutz, stating:

> I had no idea that these relationships were being mismanaged structure wise and 'event' wise on our end.
>
> This didn't happen overnight and its very obvious to me that we didn't have senior management nor board members that stayed on top of making this work effectively for both of you.

> I am truly gut wrenched and deeply sorry for what this has done to [David],
> Jarrett and all of the successful business enterprises that each of you are a
> part of.

*Id.* ¶ 38 (punctuation and alteration in original).

Despite these reassurances, BancCentral, "through counsel acting at the direction of Defendants, sent notices of default (the "Default Notices") to Plaintiffs" roughly two months later. *Id.* ¶ 39. These notices claimed Plaintiffs CHDP Lake Havasu and CHDP Pahrump "failed to maintain certain balances in the[ir] accounts," in violation of the cash deposit agreement. *Id.* ¶ 40. The notices further stated that "an event of default under the Cash Deposit Agreement constitutes an event of default under the Loan." *Id.*

Plaintiffs sent a letter rebutting the claim that they were in default, quoting the more complete provision in the cash deposit agreement: "Borrower shall at all times maintain a balance in the Account… unless Lender (i) approves of a reduction in the amount required to be maintained in the Account or (i) approves withdraw[al]s from the Account pursuant to a request from Borrower…" *Id.* ¶ 42 (ellipses in original). Plaintiffs claimed that because Defendants "Horst and Osborne had approved of the withdrawals and had wired out the funds," there was no breach of the agreement. *Id.*

Nevertheless, "the Bank, through counsel acting at the direction of Defendants, sent a follow up letter again threatening default and acceleration of" certain loans based "solely to an alleged failure to maintain the Cash Deposit Agreements." *Id.* ¶ 43. As a result of this purported breach, BancCentral, "acting at the direction of Defendants," accelerated certain loans and "declared default of the Guaranty Agreement." *Id.* ¶¶ 49–

53.  BancCentral also filed a pair of lawsuits related to the disagreement,[5] both of which were verified by Defendant Nelson as "Chief Credit Officer and Executive Vice President of the Bank."  *Id.* ¶ 47.

Finally, Plaintiffs allege "Defendants communicated to prospective buyers of the Loans intentionally defamatory statements about certain of the Plaintiffs," causing reputational harm.  *Id.* ¶ 54.  Specifically, the statements referenced Plaintiffs Portz and Lutz "screw[ing] over" and "dup[ing]" BancCentral.  *Id.*  The bank also, "acting through counsel at the direction of Defendants," sent notices of default to Plaintiffs and their affiliates regarding loans which are not the subject of this litigation.  *See id.* ¶¶ 55–58. The basis for those notices is related to the alleged breaches of the agreements described above.

Plaintiffs filed this lawsuit on March 22, 2024.  The Complaint includes six causes of action: (1) aiding and abetting breach of the implied covenant of good faith and fair dealing/tortious breach; (2) fraud/fraud in the inducement/constructive fraud; (3) tortious interference with contract/business relations; (4) tortious interference with a prospective contract; (5) negligence; and (6) slander.

## II.    <u>Legal Standard</u>

Defendants move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[5] BancCentral voluntarily dismissed both lawsuits.  *See BancCentral v. CHDP Lake Havasu LLC*, 24-212-SLP (W.D. Okla. Sept. 20, 2024); *BancCentral v. CHDP Pahrump LLC*, 24-219-SLP (W.D. Okla. Sept. 20, 2024).

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). While the complaint need not contain "detailed factual allegations," it must include "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" to avoid dismissal. *Twombly*, 550 U.S. at 555. In evaluating a 12(b)(6) motion, the Court accepts all well-pleaded allegations as true, views those allegations in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. *Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025).

## III.   Analysis

Defendants raise three grounds for dismissal under Rule 12(b)(6). First, they argue that the Complaint is devoid of "any conduct of the named Defendants that could conceivably be actionable." [Doc. No. 18] at 2. Second, they contend that the claims are "barred as premature under 12 O.S. § 682(b)" because "Defendants were acting within the scope of their roles with the Bank." *Id.* Finally, Defendants claim that the claims should "fail because the Bank and Defendants did not owe any duties to Plaintiffs under 6 O.S. § 425." *Id.* The Court takes each argument in turn.

### A.  *Sufficiency of the Allegations*

First, Defendants argue Plaintiffs have "engage[d] in improper group pleading" by "refer[ring] to 'Defendants' and 'the Bank' as a collective whole rather than making

particularized allegations as to each of the named Defendants." [Doc. No. 18] at 3. To be sure, the Complaint often makes collective references to Defendants and discusses the conduct of the bank, which is not a party to this lawsuit. But, as detailed above, the Complaint also includes sufficient allegations about the individual conduct of each Defendant, and allegations that Defendants often acted in concert. Accordingly, the Court declines to dismiss the Complaint on this ground.

Relatedly, Defendants contend the Complaint has failed to allege fraud with particularity.[6] Federal Rule of Civil Procedure 9(b) requires a party "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake." Claims of fraud must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 522 (10th Cir. 2013) (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)). But "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)).

---

[6] This argument applies to Plaintiff's second claim for "fraud/fraud in the inducement/ constructive fraud." [Doc. No. 1] at 18.

9

The Court agrees with Plaintiffs that the factual allegations are sufficient to satisfy the heightened pleading standard set forth in Rule 9(b).[7]  For example, the Complaint alleges the Board caused a new cash deposit agreement to be circulated on February 2, 2021 to "ease the concerns of regulators regarding the Elko loan."  [Doc. No. 1] ¶ 28.  On August 28, 2023, Defendants Horst and Osborne expressly approved withdrawal of the funds, and Defendant Osborne apologized for the mismanagement of the relationship the following day.  Nevertheless, Defendants directed notices of default—premised on a violation of the cash deposit agreement—to be sent to Plaintiffs on October 18, 2023.  *Id.* ¶ 39.  Defendants took the position "that the Bank could refuse to release the proceeds pursuant to the Cash Deposit Agreements," despite representations "that the Cash Deposit Agreement would not impact the ability to use the Loans' proceeds."  *Id.* ¶¶ 28–29.  Plaintiffs allege the failure to release proceeds negatively impacted them because it impeded their ability "to fund the construction of the ASCs" in accordance with the planned leverage loan structure.  *Id.* ¶ 29.  Finally, Plaintiffs allege "Defendants made false promises and misrepresentations . . . to induce Plaintiffs" enter into the loans.  *Id.* ¶ 67.  These allegations sufficiently "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  *Toone*, 716 F.3d at 522.

---

[7] Plaintiffs alternatively argue that Rule 9(b) doesn't apply because they have pled constructive rather than actual fraud.  Because the Court finds the Complaint satisfies the heightened pleading standard, it need not address this alternative argument.

**B. Section 682(b)**

Next, Defendants argue any claims against them "in their individual capacity are barred as premature" under Okla. Stat. tit. 12, § 682(B).[8] [Doc. No. 18] at 7. That statute reads, in relevant part:

> No suit or claim of any nature shall be brought against any officer, director or shareholder for the debt or liability of a corporation of which he or she is an officer, director or shareholder, *until judgment is obtained therefor against the corporation and execution thereon returned unsatisfied.* This provision includes, but is not limited to, claims based on vicarious liability and alter ego. Provided, nothing herein prohibits a suit or claim against an officer, director or shareholder for their own conduct, act or contractual obligation, *not within the scope of their role as an officer, director or shareholder,* arising out of or in connection with their direct involvement in the same or related transaction or occurrence.

Okla. Stat. tit. 12, § 682(B) (emphasis added).

According to Defendants, the Complaint's allegations pertain only to actions Defendants took within the scope of their roles at BancCentral. They urge the Court to dismiss the claims against them as premature under § 682(B). Plaintiffs contend they have pled facts demonstrating Defendants were individually involved in the events giving rise to their claims, and that "it is improper to make a determination regarding Defendants' status at the pleading stage." [Doc. No. 25] at 6.

While this case presents a closer call than some of those cited by Plaintiffs' counsel, the Court ultimately agrees that the Complaint sets forth minimal facts to avoid dismissal at the pleading stage. For example, Plaintiffs have alleged that Defendants

---

[8] Both parties rely on Oklahoma law and presume that § 682(B) applies to the Defendants as the bank's officers. Accordingly, the Court does the same. *See Union Standard Ins. Co. v. Hobbs Rental Co.*, 566 F.3d 950, 952 (10th Cir. 2009).

Horst and Osborne falsely "assured Portz that they would honor the Bank's agreements and release funds" on multiple occasions. [Doc. No. 1] ¶ 34. Plaintiffs also allege that Defendant Nelson falsely verified additional lawsuits, and that those lawsuits were used as a basis for default. *Id.* ¶¶ 45–46, 55. Accepting these facts as true and viewing them in the light most favorable to Plaintiffs, the Court finds dismissal pursuant to § 682(B) is not warranted at the pleading stage.

### C. Section 425

Finally, Defendants argue neither they nor the bank owe a legal duty to Plaintiffs, citing Okla. Stat. tit. 6, § 425. That statute reads, in relevant part:

> Unless a state or national bank shall have expressly agreed in writing to assume special or fiduciary duties or obligations, no such duties or obligations will be imposed on the bank with respect to a depositor of the bank or a borrower, guarantor or surety, and no special or fiduciary relationship shall be deemed to exist.

*Id.* Defendants argue that because the Complaint lacks any allegation of an express, written assumption of such duties, Claims I (breach of an implied duty of good faith and fair dealing, and) and Claim V (negligence) must fail.[9]

Plaintiffs push back on this assertion and point out that "Defendants offer no authority" for this interpretation of § 425. They further contend that the relevant claims do not stem from "[a] special or fiduciary duty," but instead involve only the "implied duty of good faith and fair dealing" contained in "[e]very contract in Oklahoma." [Doc. No. 25] at 11 (alteration in original) (quoting *Wathor v. Mut. Assur. Adm'rs, Inc.*, 87 P.3d 559, 561 (Okla. 2004)).

---

[9] These are the only claims implicated by Defendants' § 425 argument. *See* [Doc. No. 18] at 9.

The Complaint's allegations support Plaintiff's position. *See, e.g.*, [Doc. No. 1] at 16 (alleging claim of "aiding and abetting breach of *the implied covenant of good faith and fair dealing*/tortious breach") (emphasis added); *id.* at 21, ¶ 85 ("Defendants had a duty to act in good faith and with ordinary care and diligence when conducting the Bank's affairs."). Because nothing in Claims I or V appears to implicate a special or fiduciary duty, § 425 is inapplicable. Accordingly, Defendants' motion to dismiss the claims on this ground is DENIED.

## IV.    <u>Conclusion</u>

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss [Doc. No. 18] is DENIED.

IT IS SO ORDERED this 14th day of May, 2025.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE